```
              IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
                        DIVISION OF ST. CROIX

LAWRENCE WALCOTT, et al.        :       CIVIL ACTION
                                :
          v.                    :
                                :
DOCTOR'S CHOICE MEDICAL, INC.   :       NO. 05-121
```

MEMORANDUM

Bartle, C.J.                                            November 21, 2008

   Plaintiff Lawrence Walcott has instituted this diversity action against defendant Doctor's Choice Medical, Inc. ("Doctor's Choice") for negligence and recklessness in the preparation and manufacture of a custom made orthopedic shoe which he alleges resulted in the amputation of one of his toes. Plaintiff Rosemary Walcott, Lawrence Walcott's wife, seeks damages for loss of consortium.

   Before the court is the motion of Doctor's Choice for summary judgment. It asserts that this court lacks subject matter jurisdiction over the Walcotts' claims under the Virgin Islands Health Care Provider Malpractice Act ("Malpractice Act"), V.I. Code Ann. Tit. 27, § 166. A court may enter summary judgment only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; V.I. Loc. R. Civ. P. 56.1; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

I.

The facts are either undisputed or viewed in the light most favorable to the plaintiffs.  See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).  Lawrence Walcott suffers from diabetes which causes him to have limited sensation in his feet.  Because of this condition, Dr. Walter Pedersen, an orthopedic surgeon who treated Mr. Walcott from November, 2004 through February, 2005, advised him to obtain new orthopedic shoes from Doctor's Choice to relieve pressure on an ulcer located on the bottom of his left foot.

Doctor's Choice designs and manufactures orthopedic shoes, orthotic devices, and other prosthetic devices.  It was the first company of its kind in the Virgin Islands.  While it requested a business license for orthotics and prosthetics, no such category existed, and it instead received a license for "Consultation, Testing & Evaluation."  Doctor's Choice has never had any physicians as part of its staff.  Peter King, the sole owner of Doctor's Choice and its president, has an associate's degree in physical therapy and is a certified orthotist.  In his deposition, King described the process through which Doctor's Choice designs orthopedic shoes like the pair Mr. Walcott purchased:

> Pursuant to a doctor's verbal and/or written request, the patient is evaluated, their general anatomy for which the device that was ordered needs to be designed, the general anatomy is looked at, the gait is evaluated, the extremity is looked at for skin integrity, muscle strength, length of muscles, the patient's general cognitive

> ability and where the patient is in the age process, what his goals are personally, what he does occupationally and/or recreationally-wise.
> After that's assessed, a plan of care is designed. A plan of care design will include terms based upon height and weight, functional level.... And depending on what the area is that is in question, as in Mr. Walcott's particular case, his fifth metatarsal at the time had ulcerated. You've heard the term serval times, it's called offloading. Basically balancing the foot to decrease pressure in that area.
> ....
> After that's gathered ... [w]e pick the materials which are to be used. In this particular case, we chose leather, soft leather, we chose the density and thickness of a diabetic insert, which the material 99 percent of the time is either Plastazote in combination with another material called PPT.
> If a patient has a balancing problem, meaning that the foot is either supinated or pronated or in neutral alignment, we add adjustments which are known as flares or wedges or rockers....
> So you got the leather, then we pick the closure of the shoe. Closure of the shoe has to do with how much opening there is, and the patient's ability to close the shoe correctly.
> In this particular case, Mr. Walcott has problems with his fourth and fifth digit on the right side .... We chose to go with Velcro, instead of laces.

King Dep. at 49-52.

In late November or early December, 2004, King met with Mr. Walcott and made casts of his feet to design and manufacture a pair of shoes for him. When Mr. Walcott failed to receive the shoes soon thereafter, he contacted Doctor's Choice and was told that the cast of his right foot had been lost and would need to be remade. Doctor's Choice contracted with Christopher Borgesen, an orthotic fitter, to recast Mr. Walcott's right foot. He did

so in mid-January, 2005. On January 27, 2005, Borgesen delivered the completed pair of shoes to Mr. Walcott. He helped Mr. Walcott put the shoes on and asked him to stand.[1] Mr. Walcott does not recall receiving any instructions or information from Doctor's Choice regarding his use of the shoes. He began wearing his Doctor's Choice shoes that day.

When Mr. Walcott visited Dr. Pedersen on February 1, 2005, the doctor was not satisfied with the fit on his left foot. In response to Dr. Pedersen's concerns, King called Mr. Walcott that evening and asked him to express mail the shoe back to Doctor's Choice. Mr. Walcott did so. On February 11, 2005, Mr. Walcott received his returned shoe by mail. It had a new styrofoam spacer in it. No one from Doctor's Choice met with Mr. Walcott to check the fit of the shoe.

Mr. Walcott began wearing the adjusted shoe the following day, February 12. By February 16, Mr. Walcott's third toe on his left foot was discolored and fluid was draining from it. Dr. Pedersen examined him the next morning. According to Mr. Walcott, Dr. Pedersen determined that the toe was jamming against the shoe insert. Mr. Walcott was admitted to the hospital and his toe was amputated that day. Mr. Walcott attests that the removal of his toe has caused him to stumble more to his left side while walking.

---

1. In his deposition King corrected a prior misstatement and clarified that Borgesen is not a physical therapist and did not perform any physical therapy on Mr. Walcott.

II.

Doctor's Choice has moved for summary judgment on the ground that this court lacks subject matter jurisdiction because the Walcotts failed to comply with the Virgin Islands Health Care Provider Malpractice Act.

The Malpractice Act establishes a Medical Malpractice Action Review Committee "to arrange for expert review of all malpractice claims before actions based upon such claims are commenced in court." V.I. Code Ann. Tit. 27, § 166i(a). Proceeding through the Committee is a necessary prerequisite to commencing a medical malpractice action in court: "No action against a health care provider may be commenced in court before the claimant's proposed complaint has been filed with the Committee and the Committee has received the expert opinion as required by this section." Id. at § 166i(b). The law imposes a two-year statute of limitations on the bringing of any medical malpractice claim in court. Id. at § 166d.

A long line of cases in both the federal and territorial courts has held that the failure to file a complaint with the Medical Malpractice Action Review Committee pursuant to § 166i(b) deprives a court of subject matter jurisdiction over the claim. Berry v. Curreri, 837 F.2d 623, 625-26 (3d Cir. 1988); Missar v. Bucher, No. Civ. 206/02, 2004 WL 2203521, at *3 (Terr. V.I. Sept. 20, 2004) (collecting cases). No court has held otherwise. Missar, 2004 WL 2203521, at *5.

Missar was the first case to consider whether this jurisdictional rule applies where the defendant is a private entity and therefore presents no issue of sovereign immunity. In Missar, the Territorial Court held that § 166i(b) applies equally to government and private health care providers. Id. at *5. "If a plaintiff does not comply with the pre-filing procedures set forth in 27 V.I.C. § 166i(b) before filing a medical malpractice suit against a health care provider who meets the requirements of 27 V.I.C. § 166a, the Court lacks subject matter jurisdiction over the case." Id.

The Walcotts did not file a complaint with the Medical Malpractice Action Review Committee, and it would be futile for them to do so now because the two-year statute of limitations has run. The question before us, therefore, is whether the Walcotts' claims fall within the scope of the Malpractice Act. If they do, we lack subject matter jurisdiction.

The purpose of the Malpractice Act is to limit the liability of health care providers for claims sounding in malpractice. Ference v. V.I. Family Sports & Fitness Center, Inc., No. Civ. 657/2002, 2004 WL 626280, at *4 (Terr. V.I. Feb. 23, 2004). The Malpractice Act defines "health care provider" as:

> a person, corporation, facility or institution who must be licensed by this territory to provide health care[2] or

---

2. "Health care" is "any act, or treatment performed or furnished, or which should have been performed or furnished, by
(continued...)

>            professional medical services including a
>            medical, osteopathic, chiropractic or
>            naturopathic physician, hospital, dentist,
>            registered or licensed practical nurse to
>            include the Advanced Practice Registered
>            Nurse, optometrist, podiatrist, physical
>            therapist, psychologist, paramedical
>            personnel, emergency medical technician,
>            pharmacist and laboratory technician.

V.I. Code Ann. Tit. 27, § 166(c).  We are aware of no case which includes within the definition of "health care provider" a party who does not fall into one of the examples listed in § 166(c).  Nonetheless, while orthotic fitters are not included among the professions listed in § 166(c), our Court of Appeals has explained that "when the word 'including' is followed by a list of examples, those examples are generally considered illustrative rather than exhaustive."  In re APA Transp. Corp. Consol. Litig., 541 F.3d 233, 241 (3d Cir. 2008).

    Under § 166(c), a health care provider is one who "must be licensed by this territory to provide health care or professional medical services."  V.I. Code Ann. Tit. 27, § 166(c).  Thus, despite not being listed in the Malpractice Act, Doctor's Choice could qualify as a "health care provider" if Virgin Islands law requires it to be licensed specially to provide health care or professional medical services.  In its brief, Doctor's Choice argues that it is a licensed corporation

---

2.  (...continued)
any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment or confinement."  V.I. Code Ann. Tit. 27, § 166(b).  "Patient" is "a natural person who receives or should have received health care from a licensed health care provider, under a contract, express or implied."  Id. at § 166(i).

that also provides health care services and that it therefore qualifies as a health care provider under the Malpractice Act. This reading of the statutory text belies its plain meaning. Virgin Islands law requires every business operating there to have a business license. V.I. Code Ann. Tit. 27, § 301(a). As such, Doctor's Choice's possession of a business license does not decide the issue because its license is only for "Consultation, Testing & Evaluation." The license issued says nothing about health care or professional medical services, and there was no evaluation of Doctor's Choice with respect to its ability to provide proper orthotic shoes.

Title 27 of the Virgin Islands Code (Professions and Occupations) governs professional licensure requirements. Chapter 1 of Title 27 concerns the health professions and is also the chapter where the Malpractice Act is found. Under Chapter 1, the following health professions must have a special license to provide their services in the Virgin Islands: medicine, surgery, osteopathy, naturopathy, dentistry, nursing, pharmacy, optometry, physical therapy, chiropractic, podiatry, and physician assistant.[3] Every one of these professions is also specifically named in the text of the Malpractice Act under the definition of "health care provider," except physician assistant. V.I. Code Ann. Tit. 27, § 166(c). Hospitals also must be licensed and are included in the Malpractice Act. V.I. Code Ann. Tit. 19, § 228;

---

3. In addition, Chapter 2 requires psychologists to have licenses, Chapter 3 covers veterinarians, and Chapter 4 again addresses naturopathic physicians.

V.I. Code Ann. Tit. 27, § 166(c).  On the other hand, the Malpractice Act includes in its definition of health care provider three professions for which a specific license is not mandated:  paramedical personnel, emergency medical technician, laboratory technician.  Id.  Thus, we read the Malpractice Act to encompass only those providers of health care or professional medical services specifically identified in the Act whether or not the providers are specifically required to be licensed, and all others who must be specifically licensed to provide health care or professional medical services whether or not they are enumerated in the Act.

While Virgin Islands law requires orthotic fitters, as well as all other businesses to have a license, it does not require orthotic fitters such as Doctor's Choice to have a specific license to provide "health care or professional medical services."  In fact, King acknowledged in his deposition that the Virgin Islands has "no particular [licensure] criteria" for orthotic fitters.  King Dep. at 69-70.  In sum, Doctor's Choice is not a "health care provider" within the meaning of the Malpractice Act.  Orthotic fitters are not named in the Malpractice Act and are not required to have a license to provide health care or professional medical services.

Accordingly, we have subject matter jurisdiction over this action and will deny the motion of defendant for summary judgment.